### GOTTLIEB v. WALLACE WALL PAPER CO.

(Supreme Court, Appellate Division, First Department. April 4, 1913.)

1. BAILMENT (§ 14*)—GRATUITOUS BAILMENT—CARE REQUIRED.

    Where a designer of wall paper, desiring to submit designs to a wall paper manufacturing concern, the officers of which were temporarily in a room at a hotel, left the designs in the room on the promise of the officers to look at them as soon as they had an opportunity, the concern was a gratuitous bailee only, and required to take the care in the protection of the designs that a reasonable man would take of his own property.

    [Ed. Note.—For other cases, see Bailment, Cent. Dig. §§ 45–55; Dec. Dig. § 14.*]

2. BAILMENT (§ 31*)—GRATUITOUS BAILMENT—NEGLIGENCE OF BAILEE—EVIDENCE.

    Evidence *held* not to justify a finding of gross negligence on the part of a gratuitous bailee.

    [Ed. Note.—For other cases, see Bailment, Cent. Dig. §§ 124–131; Dec. Dig. § 31.*]

Appeal from Trial Term, New York County.

Action by Stella A. Gottlieb against the Wallace Wall Paper Company. From a judgment for plaintiff, and from an order denying a new trial, defendant appeals. Reversed, and new trial ordered.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, and SCOTT, JJ.

Kellogg & Van Hoesen, of Cortland (Franklin Pierce, of New York City, of counsel), for appellant.

Henry B. Singer, of New York City, for respondent.

CLARKE, J.   The plaintiff was a designer of wall paper.   The wall paper manufacturers of this country and Canada are in the habit of holding a two weeks' convention in this city every year where they examine submitted designs and make their plans for the forthcoming season.   The main headquarters is the Hotel Breslin.

The president, vice president, and secretary of the defendant company, whose business is located in Cortland, N. Y., had had the same rooms at the Breslin for a number of years.   The plaintiff was anxious to submit her designs to them, and finally did so early in the morning of the last day that they were in town, August 19, 1910. When she reached their rooms at about 8 o'clock they were busy with customers and asked her to come again.   Her testimony is:

"I came again, but I had another appointment some time later that morning.   He said that I should take the designs away and show them to the other party and return them, which I did.   I returned them to Mr. Seymour personally.   *   *   *   When I came again the customer was still there.   Later in the afternoon I telephoned and was told they were out.   The next morning at 8 o'clock I went to the hotel again, and I was informed that they had gone home to Cortland."

She then wrote on August 20th:

"I have just been at the hotel on my way home and discovered that you have taken my designs to Cortland with you.   Kindly retain what you may have selected, and send the rest to the Bailey Wall P. Co., Cleveland, Ohio; as I promised to send a selection to them to-day.   Kindly give this matter your immediate attention."

Which defendant answered by telegram on the 23d:

"Did not bring designs here; see hotel people at once."

And also wrote:

"I am in receipt of your letter asking regarding your designs, and I am very much surprised.   I did not see your designs when we packed up, and took it for granted that you called for them and took them away.   I went over them with Mr. Baudry and he did not find anything which he cared to purchase.   In fact we did not buy any designs this trip.   If you have not already received them, they must be at the hotel and I am anxious to hear from you that you have received them safely."

Mr. Seymour testified that plaintiff had called early in the morning about 8 o'clock with this roll of designs, and that as Mr. Baudry was busy he told her they could not examine them until he was at liberty.

"She then asked if she could leave the designs, which is frequently done by all designers.   I told her, if she wanted to do that, we could probably look them over some time during the day, or as soon as we had an opportunity to look them over together, but that we were going home that night, and that she could come back after the designs, which she agreed to do. She left the roll of designs with me at that time.   *   *   *   Mr. Baudry and I looked at them together, either before or just after our lunch, in the mid-

dle of the day. * * * After I looked at these designs and decided not to select any, I rolled them up together in the same paper in which they were delivered to us, and laid them on one of the tables in one of those salesrooms. My best recollection is that her name was written with a pencil on these parcels. I did them up in the same wrappings, and left them on the table in that room. * * * My hand bag was on the table with the designs. Some of my things were on the dresser and in the dresser drawers, toilet articles. Mr. Baudry and I went out together. When I left that room and went out of the door, the designs were on the table with this grip of mine. Mr. Baudry locked the outer door and took the key."

They had notified the hotel people that they were going to leave that night, but had not yet given up the room. When they came back about 7 o'clock and got off the elevator, they noticed that their door was open and the rooms were lighted.

"We found several of the hotel servants or attendants who were putting these rooms in order. * * * After we went in the room and found them there, we began to pick up the remainder of our belongings, * * * and I called Mr. Baudry's attention to the fact that the designs were not there. * * * We inquired if any one had been there for the designs; told the help that there was a package there, and we expected that would be called for. Q. And from what they told you and from the information they gave you, did you believe that the plaintiff had called or sent for those designs during your absence? A. Yes. * * * Completed the packing of our hand baggage and went down to the office and paid our bill and turned in the key and gave up the room. * * * As she had agreed to return for them, I took it for granted she had done so."

Mr. Baudry testified to the same effect. He says:

"I made inquiries of the help in the room as to what had become of the designs. From what they told me and the information that they gave me I thought that the plaintiff had called or sent for them. We left the hotel in that belief."

They heard nothing more after this exchange of letters and telegrams until September 30th, when they received a demand from her lawyers. Mr. Baudry testified:

"When I came to New York after the receipt of this demand I went to the Hotel Breslin to make a search for those designs. I caused a search to be made. I called there and went over the matter with a man in charge at the desk very thoroughly. * * * Nothing could be found of the package."

He also said that he had had an interview with one of the attorneys.

"I told him substantially as I told it here on the witness stand, and he told me that he did not think he had a case against me. I said something with reference to proceeding against the hotel people."

Upon this evidence the jury found a verdict for the plaintiff. She claimed $3,500. The jury gave her $500.

[1] I think the verdict was clearly wrong. This was a gratuitous bailment where the defendant was only liable for gross negligence, an inapt, but apparently settled, phrase. "Negligence" is the failure to take the degree of care which the circumstances require. The circumstances of this case required only that defendant should take the care that a reasonable man would take of his own things.

[2] The officers of this company left their own personal belongings in the room and locked the door, taking the key with them and leaving

plaintiff's designs and their own property together. When they came back and found the hotel servants in the room they made immediate., inquiry. They were informed, and believed, and relied upon the fact, the plaintiff had come or sent for her designs. They answered· her inquiries promptly, stating the facts, and subsequently made an investigation and search with the hotel officials. It seems to me that they did all that reasonable people could be expected to do. Therefore a finding of gross negligence was not only against the evidence but without evidence to support it.

The judgment and order should be reversed, and a new trial· ordered, with costs to the appellant to abide the event. All concur.